**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

BRENTEN LLOYD BIBER,

Plaintiff, **MEMORANDUM & ORDER**

v. 21-cv-02843-ST

COUNTY OF SUFFOLK, ET AL.,

Defendant.
----------------------------------------------------------X
**TISCIONE, United States Magistrate Judge:**

## INTRODUCTION

This case arises out of an incident that occurred on the evening of February 27, 2020, in the Yaphank Correctional Facility, and the months following. Plaintiff Brenten Biber, an inmate at Yaphank Correctional Facility at the time, alleges that Defendants violated his constitutional rights and brings forth this action pursuant to 42 U.S.C. § 1983 and New York State Law. Defendants have moved for summary judgment on May 9, 2025. For the reasons detailed herein, Defendants' motion for summary judgment is GRANTED.

## BACKGROUND

On the evening of February 27, 2020, Plaintiff, along with other detainees from his dorm, reported to the Yaphank Facility's Chapel for a meeting. Am. Compl. ¶29. Upon arrival, Plaintiff, along with other detainees, were searched. Am. Compl. ¶31. Plaintiff and Defendants present different facts regarding the manner in which the search was conducted, and the events following, which are summarized below.

Plaintiff first alleges that during the search, he was subjected to unnecessary and inappropriate force by Defendant Francis, without justification or reason. Am. Compl. ¶28. Plaintiff claims, that while complying with Defendant's orders, Defendant Francis drove his knee into the back of Plaintiff's right knee, causing Plaintiff's knee to immediately crack or pop. Am. Compl. ¶35. Plaintiff's right leg then buckled, causing the Plaintiff to collapse towards the floor, gasping, and crying out in pain. Am. Compl. ¶35. As a result, another detainee, Robert Upson, attempted to break his fall. Am. Compl. ¶37. Then, despite his pain, Plaintiff alleges that he was forced to walk to the chapel, while being mocked by Corrections Officers. Am. Compl. ¶40.

Plaintiff further alleges that though he reported his injury to Defendant Doherty, who was regularly on duty at these meetings, she advised him against formally reporting Defendant Francis for the injury, and that Plaintiff should "lay low", along with threats to call the Sergeant, who would force him to report back to his dorm. Am. Compl. ¶41-42. Plaintiff was then forced to sit through the meeting. Am. Compl. ¶43.

In regards to the medical treatment provided, Plaintiff claims that the following day, he was allowed to visit the Yaphank medical clinic, where he was treated by having his knee wrapped with an ace bandage and was given ice. Am. Compl. ¶45-46. Then a week after the alleged injury, he was scheduled for an x-ray, where a medical technician expressed concerns regarding his treatment and condition. Am. Compl. ¶48. Plaintiff then had to wait several weeks before being provided with his x-ray results, while medical staff allegedly downplayed the extent of his injuries. Am. Compl. ¶49. One month later, Plaintiff was provided with a knee brace, which was confiscated days later. Am. Compl. ¶50-51.

According to the Plaintiff, he was scheduled for a March 16, 2020, appointment with an orthopedic surgeon at Nassau University Medical Center ("NUMC"). Am. Compl. ¶53. Plaintiff's

father then received a voicemail from NUMC, informing him that Plaintiff had missed the appointment. Am. Compl. ¶54. According to the Plaintiff, this cancellation was due to the failure by the Corrections Officers to deliver him to the appointment, and that they cancelled several of his appointments in accordance with voicemails from NUMC. Compl. ¶55.

Plaintiff also received multiple subsequent MRI examinations at Peconic Bay Medical Center, but Plaintiff was not made aware of the results of one of his examinations, while medical records purportedly indicate that Defendants were aware of the results. Am. Compl. ¶56-58.

Four to six weeks following the alleged injury, Plaintiff attended an appointment at NUMC, wherein a trauma surgeon examined Plaintiff, diagnosed him, and concluded that he required knee surgery. Am. Compl. ¶59-60. Plaintiff asserts that several of the appointments to undergo surgery were then cancelled without his consent, allegedly forcing him to wait until he was released from custody to receive the surgery. Am. Compl. ¶61-62. As a result, he claims that he continues to experience pain and limited mobility in his knee. Am. Compl. ¶62. Plaintiff also claims that this delay was due to a policy and practice of the Defendants, essentially transferring care costs to detainees upon their release. Am. Compl. ¶63. Instead, Plaintiff believes that Defendants falsely advised hospital employees that he refused to undergo knee surgery, when he did not. Am. Compl. ¶64.

In addition to allegations of inadequate medical care pertaining to the excessive force injury, Plaintiff also asserts that he did not receive proper care for aliments stemming from a previous stomach surgery, both in the form of injections, vitamins, and improper care of sutures. Am. Compl. ¶87-88.

Plaintiff additionally alleges that Defendants retaliated against him in the form of threats, harassment, isolation and verbal abuse, seeking to dissuade him against complaining about their

allegedly unlawful actions. Am. Compl. ¶65-66. This asserted abuse took place in part in the form of a cut-off phone line, the inability to have visitors for 9 weeks, and mocking by Corrections Officers. Am. Compl. ¶67-69. Plaintiff also alleges that he attempted to make a formal complaint regarding the use of force and retaliation, but was provided with the wrong form, and his submissions were thrown out. Am. Compl. ¶70-71. Moreover, Plaintiff alleges his cell was searched, and that Plaintiff's legal documents were discarded. Am. Compl. ¶73. Lastly, Plaintiff maintains that as an additional form of retaliation, Defendant Corrections Officers began poisoning his food, by placing foreign objects in them. Am. Compl. ¶74. These objects included hair, insects, saliva, plastic, metal, and rotten ingredients, of which Plaintiff claims to have kept a detailed record of. Am. Compl. ¶76. One X-Ray apparently did reveal metal inside of Plaintiff's intestines. Am. Compl. ¶79.

Defendants present a very different version of events. Defendants first rebut Plaintiff's excessive force claim by asserting that Defendant Francis never touched Plaintiff's knee. Instead, Defendants claim that Defendant Francis's foot made contact with Plaintiff's foot in an effort to move his legs apart for a search. Mot. at 7; 56.1 at ¶314. Defendants also assert that Plaintiff did not collapse during the search, nor did Robert Upson, or any other detainee, hold Plaintiff up. Mot. at 7; 56.1 at ¶315. Defendants then set forth that following the search, Plaintiff only exhibited a slight limp, even after his speaking with Defendant Doherty. Mot. at 7-8; 56.1 at ¶316-317, ¶325-26.

In regards to the medical treatment provided, Defendants first dispute that Plaintiff's knee injury is completely attributable to Defendant Francis's movements throughout the search. Mot. at 8. Instead, Defendants reference a slip-and-fall accident in the shower two weeks prior, wherein Plaintiff allegedly injured the same knee. Mot. at 8; 56.1 at ¶267. Defendants also assert that

Plaintiff was seen by medical one day before the incident with Defendant Francis as a follow up to his fall. Mot. at 8. According to Defendants, Plaintiff attributed his knee injury to his slip-and-fall at multiple medical appointments, even after the subject incident. Mot. at 8; 56.1 at ¶275-276. In fact, Defendants claim that the first time any medical records reflect Plaintiff attributing his knee injury to the search were on July 6, 2020, over four months later. Mot. at 9; 56.1 at ¶297.

Further related to the medical treatment provided, Defendants contend that Plaintiff received the appropriate medical care. Mot. at 14. In support, Defendants offer times that Plaintiff was seen by medical, including instances where he received accommodations, referrals for an MRI or further appointments, an x-ray, topical treatments and a knee sleeve. Mot. at 13-14. Defendants also claim that Plaintiff signed medical care refusal records, which recognized that the NUMC was on lockdown due to the COVID-19 pandemic. Mot. at 14; 56.1 at ¶282. Further, Defendants maintain that it was NUMC that cancelled all appointments due to the pandemic. Mot. at 14; 56.1 at ¶284. Defendants also claim that Plaintiff declined scheduled knee surgery on the advice of his lawyer. Mot. at 14; 56.1 at ¶298-301. In sum, Defendants contend that Plaintiff received almost twenty medical appointments regarding his knee injury. Mot. at 14-15.

Regarding Plaintiff's retaliation complaints, Defendants assert that Defendant Francis specifically was not aware of this alleged retaliation while it was ongoing. Mot. at 19; 56.1 at ¶215-218. Moreover, Defendants claim that Defendant Francis was not involved in any food preparation, nor was he involved in the modification or termination of Plaintiff's phone or visiting privileges. Mot at 19-20; 56.1 at ¶227, ¶225. Further, Defendants do not dispute that Plaintiff's cell was shaken down, but rather Defendants argue that shakedowns are common occurrences and that legal papers were not seized. Mot. at 20; 56.1 at ¶179-180. Lastly, Defendants also assert that if Plaintiff

did file any grievance forms, he did not file them in accordance with the Inmate Handbook. Mot. at 17-18; 56.1 at ¶54-55.

## LEGAL STANDARD

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is material if the fact "might affect the outcome of the suit under the governing law…" *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists as to a material fact when "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

On motions for summary judgment, the moving party bears the initial burden of establishing the absence of a material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party meets that burden, the non-moving party must then show there is a genuine dispute for trial. *Id.* The burdens on both parties as to the underlying elements are aligned as they would be at trial. *Id*. "Where, as here, the nonmovant bears the burden of proof at trial, 'the movant may show prima facie entitlement to summary judgment' by either (1) 'point[ing] to evidence that negates its opponent's claims' or (2) 'identify[ing] those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact.'" *Barlow v. Male Geneva Police Officer,* 434 Fed. Appx. 22, 25 (2d Cir. 2011) (quoting in part *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir. 2006)).

When considering a motion for summary judgment, the Court must construe "all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry*

*v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). Excessive force claims, such as the one before the Court here, are very factually reliant. As such, the "granting of summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the [defendant's] conduct was objectively unreasonable." *Barlow*, 434 Fed. Appx. at 23-24 (quoting *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 123 (2d Cir. 2004)).

Assessment of a witness's credibility is a function reserved for the jury and is not appropriate on summary judgment. *Scholastic, Inc. v. Harris,* 259 F.3d 73, 87 (2d Cir. 2001). The Second Circuit has recognized an exception to that where the Plaintiff relies "almost exclusively on his own testimony, much of which is contradictory and incomplete." *Jeffreys v. City of N.Y.*, 426 F.3d 549. 554 (2d Cir. 2005). However, "summary judgment cannot be defeated by the presentation by the Plaintiff of but a 'scintilla of evidence' supporting [his] claim…[the] preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 726 (2d Cir. 2010) (quoting in part *Liberty Lobby,* 477 U.S. at 251-52).

## DISCUSSION

### I. Defendants are Entitled to Summary Judgment Based Upon Plaintiff's Excessive Force Claim

Typically, excessive force claims raised by individuals who are sentenced and incarcerated fall under the Eighth Amendment. *See Whitley v. Albers*, 475 U.S. 312, 327 (1986). The claim of excessive force by a corrections officer against a prisoner incarcerated after a conviction derives from a violation of the Eighth Amendment right to be free of "cruel and unusual punishments," applied against the states through the Due Process Clause of the Fourteenth Amendment. U.S.

Const. amend. VIII; *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). Alternatively, claims asserting that excessive force was used in the course of an arrest fall under the Fourth Amendment. *Brown v. City of New* York, 798 F.3d 94, 100 (2d Cir. 2015) (citing to *Graham v.* Connor, 490 U.S. 386, 395 (1989)).

At the time of this excessive force incident, Plaintiff was sentenced and incarcerated at the Yaphank Correctional Facility. 56.1 at ¶19. Accordingly, although Plaintiff originally brought forth his excessive force under the Fourth Amendment, the Court elects to apply the more appropriate vehicle, the Eighth Amendment.

To successfully litigate such a claim, a plaintiff must establish that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Anderson v. Sullivan*, 702 F. Supp. 424, 426 (2d Cir. 1988). The factors to be considered in assessing whether the use of force was violative of a prisoner's constitutional rights are: "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973).

Minor injuries can support Eighth Amendment claims "as long as the amount of force used is not de minimis." *Thompson v. Booth,* 16-CV-3477, 2021 WL 918708, at *5 (S.D.N.Y. Mar. 10, 2021) (citing *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir. 2000)) (quoting *United States v. Walsh,* 194 F.3d 37, 50 (2d Cir. 1999)). The Supreme Court has re-enforced that "significant injury" is not "a

threshold requirement for stating an excessive force claim." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). Instead, "the 'core judicial inquiry'…[is] whether force was applied in a good-faith effort to maintain or restore disciple, or maliciously and sadistically to cause harm…" *Id.* Whether the wrongdoing was harmful enough to establish a constitutional violation is judged in light of "contemporary standards of decency" and, where prison officials use force to cause harm maliciously or sadistically, "contemporary standards of decency always are violated…whether or not significant injury is present." *Wright v. Goord*, 554 F.3d 255, 268-69 (2d Cir. 2009). (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonably jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v.* Harris, 550 U.S. 372, 380 (2007). Accordingly, in matters where dispositive evidence is allegedly captured on video, courts should consider that video evidence when summary judgment motions are filed, to determine if issues of material fact still persist. *Herrera-Amador v. New York City Police Dep't,* No. 16-CV-5915 (NGG) (VMS), 2021 WL 3012583, at *21 (E.D.N.Y. Jul. 16, 2021). Alternatively, summary judgment is not appropriate when the video evidence fails to absolutely resolve the issues of material fact. *See Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017) (noting that "*Scott* is best understood to permit summary adjudication of a plaintiff's civil rights claims only in those *exceptional* cases where the video evidence in the record is sufficiently to 'blatantly contradict []" one party's version of events.") (emphasis added).

It must not be understated that summary judgment is a high bar for a movant to reach, and the facts therefore must be viewed in a light most favorable to the non-moving party. Evaluating if a use of force is justified is tremendously fact intensive and often must be left to the discretion

of a jury. *Thompson*, 2021 WL 918708, at *6 (citing *Castro v. City of New York,* No. 16-CV-8147, 2020 WL 6782000, at *10 (S.D.N.Y. Nov. 18, 2020) (quoting *Ismael v. Charles*, No. 18-CV-3597, 2020 WL 4003291, at *7 (S.D.N.Y. Jul. 15, 2020). Accordingly, a grant of a summary judgment motion on excessive force claims is often unwarranted. *Id*. Even when a plaintiff's evidence seems minor, and the proof surrounding the excessive force is not strong, the Second Circuit has reversed grants of summary judgment in Eighth Amendment Excessive force claims. *Id.* (citing *Wright*, 554 F.3d at 269). Nevertheless, those principles do not preclude summary judgment where, after viewing the record in the light most favorable to Plaintiff, no reasonable juror could find that the force was applied maliciously and sadistically for the purpose of causing harm. Here, Defendants have met that high standard.

When it comes to the allegedly dispositive nature of the video footage, examining the video in a light most favorable to Plaintiff permits summary judgment to be granted. This is due to an application of the factors needed in order to maintain an excessive force claim, and the reality that video evidence is only dispositive in exceptional cases. *Hulett*, 253 F. Supp. 3d at 482. Here, the video does not merely create a competing version of events; rather, it depicts the limited nature of the physical contact at issue and fails to show force from which a reasonable juror could infer that Defendant Francis acted maliciously and sadistically for the purpose of causing harm.

In applying these factors, this Court cannot conclude that a reasonable juror could find the use of force displayed by Defendant Francis in the video to be unconstitutional, especially given that Plaintiff offered conflicting accounts of the alleged excessive force. While the video shows that Defendant Francis most certainly made contact with Plaintiff's leg in the course of a pat-down search, that alone is insufficient to permit a reasonable juror to conclude that the contact constituted wanton or malicious force. It seems as though the kick was not made in order to feel a particular

spot on the Plaintiff, but rather to move his legs wider to facilitate the search. The same may have been accomplished through asking Plaintiff to move his leg wider, or even a gentler physical indication to adjust his stance. This appears to be a standard search. There is no indication of any exigent or emergency circumstances that might have justified an officer moving quickly, and maybe even somewhat aggressively through a search, in order to maintain peace. To reiterate the above, this maneuver could have been accomplished through an order to Plaintiff, who seemed to be compliant. But the relevant inquiry under the Eighth Amendment is not whether Defendant Francis employed the least forceful means available or whether, in hindsight, another course of action would have been preferable. See *Anderson*, 702 F. Supp. at 426. Even drawing all reasonable inferences in Plaintiff's favor, the footage does not show a strike or application of force from which a reasonable juror could infer an effort to maliciously or sadistically inflict harm. Although the video contains no audio, the absence of audio does not create a genuine issue of material fact as to what the video itself plainly depicts.

Furthermore, the facts surrounding the extent of Plaintiff's injury do not independently warrant denial of summary judgment. Courts consistently have held that injuries need not be significant in order to support an excessive force claim. These injuries just must not be de minimis. *Thompson v. Booth*, 2021 WL 918708, at *5. A de minimis injury is more akin to slight bruising or a minor pain that only lasts a few days, not Plaintiff's allegedly limited mobility and agonizing pain in his knee that necessitates surgery. Compl. ¶97-98. See *Perry v. Stephens*, 659 F. Supp. 2d 577, 582 (S.D.N.Y. 2009) (holding that a small bruise and minor pain that only lasted a few days was de minimis). Thus, viewing the evidence in Plaintiff's favor, the Court does not rest its determination on a conclusion that Plaintiff's alleged injury was insufficiently serious. Even assuming that Plaintiff suffered the injuries alleged, significant injury is not a threshold

requirement, just as the existence of an injury does not itself establish that constitutionally excessive force was used. See *Wilkins*, 559 U.S. at 37. The nature and extent of Plaintiff's asserted injury therefore cannot overcome the absence of evidence from which a reasonable juror could find that Defendant Francis acted with the requisite culpable state of mind.

The core judicial inquiry lies with the last factor: "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm." *Glick*, 481 F.2d at 1033. It is true that Plaintiff admitted this minor contact with his leg was an "accidental incident". Mot. at 9; 56.1 at ¶87. That concession is particularly significant because the Eighth Amendment requires more than proof that physical contact occurred or that the contact ultimately resulted in injury. It requires evidence from which a reasonable juror could conclude that Defendant acted with the requisite wantonness and applied force maliciously and sadistically to cause harm. *Blyden*, 186 F.3d at 262. Plaintiff's own characterization of the incident as accidental is fundamentally inconsistent with such a finding. Nor is the Court presented with other evidence sufficient to permit a reasonable juror to infer the necessary state of mind notwithstanding Plaintiff's concession. The video depicts a brief physical maneuver undertaken during a pat-down search and does not show Defendant Francis striking Plaintiff repeatedly, continuing to use force after any conceivable need for it had ceased, or otherwise engaging in conduct from which malicious or sadistic intent could reasonably be inferred. Thus, although subjective intent will frequently present a factual question, Plaintiff must still identify evidence from which a reasonable juror could draw the required inference. On this record, he has failed to do so.[1]

[1] Notably, the video directly contradicts the allegations in Plaintiff's complaint that Defendant Francis drove his knee into the back of Plaintiff's right knee; and that Plaintiff's right leg then buckled, causing the Plaintiff to collapse towards the floor, gasping, and crying out in pain. Am. Compl. ¶35. No such actions are depicted in the video, which amounts to a simple pat-down search where the officer made minimal contact with Plaintiff's leg in

Overall, even construing the evidence and all reasonable inferences in Plaintiff's favor, the Court is not presented with sufficient evidence from which a reasonable juror could find the requisite wantonness. The video shows limited contact undertaken in connection with a pat-down search; Plaintiff himself characterized the incident as accidental; and the record lacks evidence from which malicious or sadistic intent reasonably could be inferred. Although Plaintiff alleges substantial injury, the severity of that injury cannot, standing alone, transform an accidental or otherwise non-wanton use of force into an Eighth Amendment violation. Nor can inconsistencies in Plaintiff's testimony themselves create a triable issue where the affirmative evidence is insufficient to support the required constitutional culpability. Accordingly, because no reasonable juror could conclude on this record that Defendant Francis applied force maliciously and sadistically for the purpose of causing harm, Defendants' Motion for summary judgment as to Plaintiff's excessive force claim is granted.

## II. Defendants are Granted Summary Judgment as to Plaintiff's Deliberate Indifference Claim

Defendants' second argument is that they were not deliberately indifferent to Plaintiff's medical needs, as his medical records instead illustrate that he allegedly received "frequent, timely, and appropriate medical care." Mot. at 10. For the following reasons, summary judgment is appropriate on this claim.

As previously mentioned, an inmate's protection against "cruel and unusual punishment" is derived from the Eighth Amendment of the Constitution, as opposed to the Fourteenth

order to spread his legs for the search. Certainly, the video does not reveal Plaintiff's leg buckling, or Plaintiff falling to the floor crying in pain. Indeed, Plaintiff remains standing for the entire search, and then simply walks down the hallway to the chapel. Thus, even if Plaintiff's allegations about the level of force could be sufficient on their own to sustain his burden, the objective evidence shows them to be false (or at least grossly exaggerated) and something no reasonable juror could rely upon.

Amendment, which provides similar protections for pre-trial detainees. U.S. Const. amend. VIII, U.S. Const. amend. XIV, *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000); *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). Accordingly, this claim must be evaluated under the Eighth Amendment, since Plaintiff was sentenced and incarcerated at the Yaphank Correctional Facility at the time of the alleged incidents. 56.1 at ¶19. A prison staff's "deliberate indifference" to the "serious medical needs" of inmates constitutes cruel and unusual punishment of inmates, as prohibited by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). In evaluating a deliberate indifference claim, two prongs must be satisfied.

First, an objective prong: the deprivation must have been sufficiently serious. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). This requires that the inmate actually be deprived of "adequate medical care" and that inadequacy be sufficiently serious. *Salahuddin*, 467 F.3d at 279-80. An evaluation of an actual deprivation holds that prison officials who acted reasonably cannot be found liable, while those who failed to take reasonable measures may be subject to liability. *Id.*; *Farmer v. Brennan*, 511 U.S. 825, 845 (1994). In determining if a deprivation is sufficiently serious, the standard may contemplate if there exists a "condition of urgency, one that may produce death, degeneration, or extreme pain". *See Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting). This also contemplates if the medical need at issue was "(1) was significant enough that a reasonable doctor or patient would find it worthy of comment or treatment; (2) significantly affects the prisoner's daily activities; and (3) causes chronic and substantial pain." *Massapinero v. Rikers Island Mental Health Dep't Servs.*, 2015 WL 1473313, at *2 (S.D.N.Y. Mar. 31, 2015) (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998)). Further, medical conditions are deemed serious if failing to treat the condition may result in "the unnecessary and wanton infliction of pain" *Estelle*, 249 U.S. at 104. Moreover, in "a temporary delay or interruption in the provision

of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in the treatment", but when an inmate contends that officials failed to provide treatment for his medical condition, it is appropriate to focus on the "underlying serious medical condition" *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). An intentional denial to the access of medical care, or the interference with an inmate's prescribed treatment also violates the Eighth Amendment. *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977).

Second, deliberate indifference claims require a subjective prong to be evaluated. Essentially, the charged official must have acted with a sufficiently culpable state of mind. *See Wilson*, 501 U.S. at 298. This state of mind is one that is more than mere negligence, and yet less than actions taken just for the purpose of causing harm. *See Farmer*, 511 U.S. at 835-36 (1994). This standard requires that a prison official "knows of and disregards an excessive risk to inmate health or safety", which asks that the official be "aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference". *Id*. at 837. Therefore, the requisite state of mind is akin to recklessness. *Id.* at 839-40. Rather than this prong being evaluated objectively, case law mandates a subjective "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment". *See Wilson*, 501 U.S. at 299.

Further, "not every lapse in prison medical care will rise to the level of a constitutional violation". *Carpenter*, 316 F.3d at 184. For instance, disagreements over proper medical treatment do not rise to the level of a constitutional claim. *Chance v. Armstrong*, 143 F.3d at 703. The treatment given to an inmate solely must be adequate. *Id*. Even if an inmate may have preferred a different treatment option, that does not necessarily signal a violation of the Eighth Amendment. *Id.* (citing *Dean v.* Coughlin, 804 F.2d 207, 215 (2d Cir. 1986)). Nevertheless, in certain situations,

"a physician may be deliberately indifferent if he or she consciously chooses "an easier and less efficacious" treatment plan. *Id*. (citing *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974)).

In evaluating the objective prong of a deliberate indifference to medical treatment analysis, a reasonable juror may first find that Plaintiff's knee condition was sufficiently serious. First, it is necessary to address Defendants' contention that courts in this circuit have often held that "knee pain does not constitute a serious medical condition" Mot. at 16. Though supported by precedent, Defendants fail to recognize that the court stated they were not "categorically ruling out knee injuries as a possible basis for an Eighth Amendment claim", but that "the injury alleged here (which the evidence indicates was a torn meniscus…), was not sufficiently serious to give rise to a constitutional claim". *Johnson v. Wright*, 477 F. Supp. 2d 572, 575–76 (W.D.N.Y. 2007). Though not limited in the allegation, Plaintiff in the instant case claims his injury to be a "deformity of the right knee and leg", a "torn meniscus", a "broken meniscus", "surgery and future surgeries", "limited mobility, severe and persistent shooting pain in his right knee and right leg… grinding of his right knee, and intermittently agonizing pain in his right leg and knee.." Am. Compl. ¶97-98. A reasonable juror may view these injuries as more severe than the torn meniscus alleged in *Johnson*. Moreover, the assertion that Plaintiff's injury was serious is bolstered by the allegation that a medical professional commented on the condition of his knee. See Am. Compl. ¶48 (stating a medical technician said to the Plaintiff, "[m]an your leg is swollen! I can't believe they're not taking you to a doctor"). Accordingly, viewing the facts in the light most favorable to Plaintiff, the Court assumes for purposes of this Motion that the underlying knee condition was sufficiently serious. That conclusion, however, does not establish that Plaintiff was actually deprived of adequate medical care, which is independently required under the objective prong. *Salahuddin*, 467 F.3d at 279-80.

Even if, as Plaintiff contends, some of his outside appointments were cancelled or delayed, that factual dispute is not material unless the challenged delay or interruption itself amounted to a sufficiently serious deprivation of medical care. See *Carpenter*, 316 F.3d at 185-86. On the one hand, Plaintiff holds that corrections officers cancelled his appointments, while Defendants argue these appointments were cancelled either by Plaintiff, or due to the COVID-19 pandemic. Am. Compl. ¶55; Mot. at 15. The record cited by Defendants includes medical care refusal records recognizing that NUMC was on lockdown due to the COVID-19 pandemic, 56.1 at ¶282, evidence that NUMC cancelled appointments due to the pandemic, 56.1 at ¶284, and evidence that Plaintiff ultimately declined scheduled knee surgery on the advice of his lawyer. 56.1 at ¶298-301. Moreover, Defendants contend, without a sufficient evidentiary showing to the contrary, that Plaintiff received almost twenty medical appointments regarding his knee injury, including an x-ray, MRIs, topical treatment, a knee sleeve, accommodations, and referrals for additional care. Mot. at 13-15. Even crediting Plaintiff's contention that some appointments were missed, no reasonable juror could conclude from this record that Defendants intentionally denied him access to medical care or interfered with prescribed treatment in a manner rising to the level of an Eighth Amendment violation. At most, the evidence supports disagreement over the timing and adequacy of treatment, which does not itself establish deliberate indifference. See *Chance*, 143 F.3d at 703.

In regards to the subjective prong of a deliberate indifference to medical treatment analysis, Plaintiff has likewise failed to identify evidence from which a reasonable juror could find that a charged official knew of and disregarded an excessive risk to his health. *See Farmer*, 511 U.S. at 837. Overall, this particular portion of the analysis requires the Court to conduct a subjective inquiry into the state of mind of the officials. *See Wilson*, 501 U.S. at 299. While questions of credibility are ordinarily resolved by a trier of fact, *see Scholastic, Inc.*, 259 F.3d at 87, that

principle does not relieve Plaintiff of his obligation at summary judgment to identify evidence from which the requisite reckless state of mind may reasonably be inferred. The repeated medical visits, diagnostic testing, accommodations, referrals, and eventual surgical consultation reflected in the record are inconsistent with an inference that Defendants consciously disregarded Plaintiff's medical needs. The same is true of Plaintiff's allegations regarding treatment related to his prior stomach surgery. *See* Am. Compl. ¶87-88. Plaintiff alleges inadequate injections, vitamins, and care of sutures, but does not identify evidence establishing that any Defendant knew of and consciously disregarded a substantial risk arising from those conditions. Therefore, even assuming the objective seriousness of Plaintiff's medical conditions, no reasonable juror could find the subjective deliberate indifference required by the Eighth Amendment, and Defendants' Motion for summary judgment on Plaintiff's deliberate indifference claim is granted.

## III. Summary Judgment is Granted Due to Plaintiff's Failure to Exhaust His Administrative Remedies

Defendants next argue that they are entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies prior to filing this suit, as required by the Prison Litigation Reform Act. Mot. at 16. Seemingly, it is Defendants' contention that Plaintiff failed to file his grievances in a timely manner or failed to file grievances at all. Mot. at 17-18. For the following reasons, Defendants have met their burden on this affirmative defense.

The Prison Litigation Reform Act ("PLRA") mandates that, "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. §1983], or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that this exhaustion requirement is "mandatory" wherever administrative remedies are "available." *Ross v. Blake,* 578 U.S. 632, 639 (2016). A remedy is available where the procedure is "capable of use" to obtain

"some relief for the action complained of." *Id.* at 642 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001). An administrative procedure is unavailable where it operates as a simple dead end, is so opaque as to be practically incapable of use, or where prison administrators thwart inmates' attempts to take advantage of it. *Id.* at 643-44. "Because failure to exhaust [administrative remedies] is an affirmative defense, [the] defendant[] bears the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cnty. Sheriff's Dep't,* 788 F.3d 54, 59 (2d Cir. 2015). "[I]t is the prison's requirements…that define the boundaries of proper exhaustion." *Hayes v. Dahlke,* 976 F.3d 259, 268 (2d Cir. 2020) (quoting *Jones v. Bock,* 549 U.S. 199 (2007)).

Since an inmate's alleged failure to exhaust all administrative remedies is an affirmative defense under the PLRA, an inmate is not required to specially plead or demonstrate exhaustion in his complaint. *See Jones v. Bock,* 549 U.S. 199, 211–12 (2007). He need only a "short and plain statement of the complaint". Fed. R. Civ. P. 8(a)(1).

The governing procedure here falls under the authority of the Suffolk County Sheriff's Office. Their guidelines are outlined within the Inmate Handbook, which is given to all inmates upon their admission to a Suffolk County Correctional Facility. Mot. at 17; Ex. P to Mot. Within said handbook, it is outlined that all grievances must be filed within five (5) days of the act or occurrence that gives rise to the grievance. Mot. at 17; Ex. P to Mot.

Defendants' argument hinges on some of Plaintiff's admissions. First, Plaintiff admits that he received the inmate handbook upon admission to the Yaphank Correctional Facility. Mot. at 17; 56.1 at ¶54. Second, Plaintiff admits that he filled out a grievance on February 27, 2020, pertaining to the alleged excessive force incident, but did not file said grievance until several weeks

thereafter. Mot. at 17; 56.1 at ¶54. Defendant fails to include the rest of Plaintiff's statement where Plaintiff seemingly attempted to proffer an explanation before being cut off by Defendant as to why he waited until several weeks after the incident to file the grievance, claiming he "didn't want to have any –". Exh. C to Mot. at 71. While that incomplete answer may suggest that Plaintiff intended to offer some explanation, speculation as to what the unfinished testimony might have been is insufficient to create a genuine dispute of material fact. Once Defendants established the existence of the applicable grievance procedure and Plaintiff's admitted noncompliance with its five-day filing requirement, Plaintiff was required to identify evidence showing either proper exhaustion or that the remedy was unavailable. *See Fincher*, 604 F.3d at 726.

At the summary judgment stage, it is important to know why Plaintiff contends that he did not file the grievance form within the five-day period, because a prisoner need not exhaust remedies that are not actually available. *See Ross*, 578 U.S. at 635. But the record must contain evidence from which a reasonable juror could find unavailability; it is not enough that such an explanation may have existed. Plaintiff alleges an investigation at the request of Judge Camacho was conducted, resulting in a finding that inmates were being provided with outdated grievance forms. 56.1 at ¶56. Construing that assertion in Plaintiff's favor, it still does not establish that the grievance process operated as a dead end, was so opaque as to be incapable of use, or that administrators thwarted Plaintiff's use of it. *See Ross*, 578 U.S. at 643-44. Indeed, Plaintiff admits that he received the handbook and completed a grievance concerning the February 27 incident, but simply did not submit it within the required period. Although it is not dispositive that Plaintiff did not fully explicate exhaustion in his Complaint because an inmate need only provide a short and plain statement at the pleading stage, see *Jones*, 549 U.S. at 211–12, that pleading rule does not excuse the absence of evidence at summary judgment showing proper exhaustion or unavailability.

The record also contains competing assertions pertaining to apparent grievances concerning the alleged retaliation and inadequate medical care. Plaintiff contends that he filed over twenty grievances following proper protocol. Pl.'s Opp'n at 17; Ex. B to Opp'n. Alternatively, Defendants offer testimony that Plaintiff never filed any grievances throughout his incarceration. Mot. at 18; Ex. P to Mot. But the existence of competing assertions does not itself preclude summary judgment where Plaintiff does not identify evidence showing that the particular grievances relevant to his claims were timely submitted in accordance with the procedure set forth in the Inmate Handbook. The admitted untimeliness of the grievance concerning the February 27 incident remains undisputed, and Plaintiff's generalized assertion that he submitted numerous other grievances does not establish proper exhaustion of each claim before the Court. A scintilla of evidence is insufficient to defeat summary judgment. *Fincher*, 604 F.3d at 726.

Lastly, the evidence surrounding the shakedown of Plaintiff's cell does not create a genuine dispute as to availability of the grievance process. Specifically, Plaintiff contends that Defendant Corrections Officers intentionally destroyed filed grievances and other documents. Pl.'s Opp'n at 17. Defendants do not dispute that Plaintiff's cell, as well as the entire housing area, were searched. Mot. at 20; 56.1 at ¶126. But the occurrence of a shakedown does not establish that grievance materials were destroyed, nor does it explain Plaintiff's admitted failure to submit the February 27 grievance within the five-day period before any later destruction could have occurred. Even viewing Plaintiff's allegation in the light most favorable to him, the record is insufficient to permit a reasonable juror to conclude that prison administrators rendered the grievance process unavailable within the meaning of *Ross*. Accordingly, Defendants are entitled to summary judgment on their exhaustion defense.

## IV. Summary Judgment is Appropriate Regarding Plaintiff's Failure to Intervene and Retaliation Claims

### A. Failure to Intervene

"Absent direct participation in an act of excessive force, defendants may still be held liable for constitutional violations under a failure to intervene theory." (Se*weid v. Cnty. of Nassau*, No. 21CV03712JMAAYS, 2024 WL 693981, at *18 (E.D.N.Y. Feb. 20, 2024)) (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)); *see also Gardner v. City of New York*, No. 16-CV-06476 (NG)(ST), 2021 WL 3848112, at *8 (E.D.N.Y. Aug. 27, 2021) (writing that failure to intervene theory is inapplicable where particular defendants are the direct participants in the allegedly excessive use of force). Law enforcement officials, which include prison officials like corrections officers, "have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). As a result, liability may ensue when an officer observes excessive force in use, or has reason to know that it will be. *Curley,* 268 F.3d at 72 (citing *Anderson,* 17 F.3d at 557).

Requisite for liability to attach to a defendant's actions is first the presence of an underlying constitutional violation. *Forney v. Forney*, 96 F. Supp. 3d 7, 13 (E.D.N.Y. 2015). Second, a defendant must have had a "realistic opportunity to intervene to prevent harm from occurring". *Anderson*, 17 F.3d 552 at 557. Determining if a defendant did have a realistic chance to intervene depends on a variety of factors, including but not limited to: the number of officers present at the incident, their placement, the surrounding environment, and the nature of the assault. *Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016). The inquiry into whether an officer had a realistic opportunity to intervene is typically a question for a jury, unless the evidence is such that no reasonable jury could rule otherwise. *Terebesi,* 764 F.3d at 244.

In the instant matter, Plaintiff contends that the injury caused to him by Defendant Francis constitutes a constitutional violation. The Court's earlier analysis, however, determines that no reasonable juror could find that Defendant Francis's conduct amounted to excessive force under the Eighth Amendment. Requisite for liability under a failure to intervene theory is first the presence of an underlying constitutional violation. *Forney*, 96 F. Supp. 3d at 13. Because that predicate violation is absent, Plaintiff's failure to intervene claim necessarily fails. Moreover, even if an underlying violation could be assumed, the brief contact depicted in the video does not provide a basis from which a reasonable juror could conclude that Doherty or the John Doe corrections officers had a "realistic opportunity to intervene to prevent harm from occurring." *Anderson*, 17 F.3d at 557. Plaintiff alleges that Doherty and the John Doe officers knew or should have known of Defendant Francis's "violent tendencies and that he was a violence prone officer" and that they failed to prevent, intercede, intervene, or otherwise stop Defendant's alleged use of excessive force against Plaintiff. Am. Compl. ¶¶122-23. Defendants refute these assertions, claiming that Doherty testified that she did not personally observe any officers use force against Plaintiff and that there was no assertion in the record to support that Francis was a "violence prone officer." Mot. at 19. While the inquiry into whether an officer had a realistic opportunity to intervene is typically a question for a jury, summary judgment is appropriate where the evidence is such that no reasonable jury could rule otherwise. *Terebesi*, 764 F.3d at 244. This is such a case. Therefore, Defendants' Motion for summary judgment is granted with respect to Plaintiff's failure to intervene claim.

**B. Retaliation**

To prevail on a retaliation claim, Plaintiff bears the initial burden of showing: (1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against

the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action. *Shariff v. Poole*, 689 F. Supp. 2d 470, 478 (W.D.N.Y. 2010). The filing of formal prisoner grievances is protected conduct under the First Amendment. *Id.* (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (prison officials may not retaliate against prisoners for petitioning for redress of grievances)); *see Smith v. Woods,* No. 9:03–CV–480, 2006 WL 1133247, at *10 (N.D.N.Y. Apr. 24, 2006) (extending First Amendment protection to oral complaints made to correctional officers), *aff'd,* 219 Fed.Appx. 110 (2d Cir.2007).

Here, Plaintiff, like the plaintiff in *Shariff*, satisfies the first element of the retaliation claim as he alleges that he was subjected to retaliatory conduct for the filing of grievances against prison staff. *Shariff*, 689 F. Supp. 2d at 478.[2] With regard to the second element requiring adverse action, Plaintiff alleges that Defendant's retaliated following the filing of grievances that took the form of denial of urgent medical care, denial of visits from his parents and attorney, denial of Plaintiff's use of his phone line, shakedown of Plaintiff's cell, and tampering with Plaintiff's food. Am. Compl. ¶123. Searches and shakedowns of Plaintiff's cell do not constitute adverse action as they do not amount to violations of constitutionally protected rights. *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ( "It is well-settled that the prohibition against unreasonable searches and seizures does not apply to a prison cell."); *Willis v. Artuz*, 301 F.3d 65, 67–69 (2d Cir.2002); *Rodriguez v. McClenning*, 399 F.Supp.2d 228, 239 (S.D.N.Y.2005) (An inmate has no right to be free from searches of any kind, including those alleged to be "retaliatory"). Plaintiff's other allegations, namely denial of urgent medical care and tampering of

[2] Defendants also argue that Plaintiff's retaliation claim is barred because he did not properly exhaust the requisite grievance process. As discussed above, the Court agrees that Plaintiff has not produced evidence sufficient to create a genuine dispute as to proper exhaustion or the unavailability of administrative remedies. That determination provides an additional basis for summary judgment on the retaliation claim to the extent it was subject to the PLRA exhaustion requirement.

food, can constitute adverse action under the second prong if supported by evidence. *See Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (prison officers denying the plaintiff a high fiber diet and making him wait for medical appointments were sufficient to constitute adverse action). The issue, therefore, becomes whether the record contains evidence from which a reasonable juror could find that Defendants took those actions, and did so because of Plaintiff's protected conduct.

To satisfy the third prong, Plaintiff's allegations must be "'sufficient to support the inference that the speech played a substantial part in the adverse action.'" *Id.* at 354 (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir.2001) (overruled on other grounds)). Here, Plaintiff alleges that Defendants took these adverse actions against Plaintiff "[i]mmediately following Plaintiff filing these grievances." Opp'n at 20. A short time frame between protected conduct and adverse action can support an inference of retaliatory motive. *See Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002) (overruled on other grounds). But at summary judgment, temporal proximity and allegations alone do not relieve Plaintiff of the obligation to identify evidence from which a reasonable juror could find that the challenged actions were taken because of the protected conduct. Defendants assert that Defendant Francis was not aware of the alleged retaliation while it was ongoing, Mot. at 19; 56.1 at ¶215-218, was not involved in food preparation, and was not involved in the modification or termination of Plaintiff's phone or visiting privileges. Mot. at 19-20; 56.1 at ¶225, ¶227. Plaintiff has not identified evidence sufficient to connect these alleged adverse actions to the filing of his grievances or to establish that the particular Defendants responsible for the challenged acts acted with a retaliatory motive. At most, the record provides a temporal inference unsupported by evidence of knowledge or participation. That is insufficient to permit a jury to properly find for Plaintiff. *See Fincher*, 604 F.3d at 726. Therefore, Defendants' Motion for summary judgment with respect to Plaintiff's retaliation claim is granted.

**V. Defendants are Entitled to Summary Judgment on Plaintiff's State Law Claims**

Being that Plaintiff has voluntarily withdrawn his claims for Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress, it is only necessary to address Plaintiff's New York State Law claims of Assault, Battery and Negligence. As argued by both Plaintiff and Defendants, the standards of law applicable to excessive force claims are identical to that of assault and battery claims. *See* Mot. at 22 (citing *Humphrey v. Landers*, 344 Fed. Appx. 686, 688 (2d Cir. 2009)); *see also* Pl.'s Opp'n at 22 (citing *Centeno v. City of New York*, 2019 WL 1382093, at *6, 2019 U.S. Dist. LEXIS 51890 at *26-*27 (S.D.N.Y.)). As a result, because the aforementioned discussion establishes that no reasonable juror could find Defendant Francis's use of force unconstitutional, the same analysis warrants summary judgment on Plaintiff's assault and battery claims. Lastly, although Plaintiff's negligence claim is a state law claim evaluated independently of § 1983, New York law does not permit a plaintiff to recast the same allegedly intentional use of force as negligence. *See Dineen ex rel. Dineen v. Stramka*, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002) (holding that when excessive force and assault claims are premised upon allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie). To the extent Plaintiff's negligence theory is premised on medical treatment or other conduct distinct from the alleged use of force, Plaintiff has not identified an independent evidentiary basis from which a reasonable juror could find breach and causation beyond the same conduct already found insufficient to sustain his constitutional claims. Accordingly, Defendants' Motion for summary judgment is granted as to Plaintiff's remaining state law claims.

**VI. Monell Liability**

Defendant seeks summary judgment on the ground that Plaintiff has failed to state a claim under 42 U.S.C. § 1983 for municipal liability pursuant to *Monell v. Department of Social Services*

*of City of New York*, 436 U.S. 658 (1978). "To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013). "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *cf. Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against government agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), adopted by 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester County*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Apr. 16, 2010) (dismissing a claim against the county because the complaint "[did] not allege the existence of an unconstitutional custom or policy"), *adopted sub nom. Arnold v. Westchester Cty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010). The fifth element—that an official policy of the municipality caused the constitutional injury—reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be held liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469,

478 (1986) (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity itself commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."). "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), aff'd, 75 Fed.Appx. 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *see also Roe*, 542 F.3d at 37 (describing the second category for establishing *Monell* liability); *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (describing methods of establishing Monell liability). Moreover, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy Monell's requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue."); *Roe*, 542 F.3d at 37 (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury" (quoting *Brown*, 520 U.S. at 404)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (internal quotation marks omitted)).

In the instant matter, Plaintiff cannot satisfy the requirements for Monell liability because, as delineated extensively in the previous sections of this opinion, the record does not permit a reasonable fact finder to conclude that Plaintiff suffered an underlying constitutional deprivation.[3]

[3] To reiterate, the prongs for Monell liability are (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury. Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008). Because the Court has determined that the record does not permit a reasonable fact finder to find an underlying constitutional deprivation, Plaintiff cannot satisfy the second prong.

Even assuming an underlying constitutional violation, Plaintiff has also failed to identify evidence of a municipal policy or custom that caused his alleged injury. While Plaintiff has not identified a formal policy or widespread customs or practices that led to his injury, Plaintiff alleges a "failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010). Specifically, Plaintiff claims that Defendant County has "failed to maintain a proper system for oversight of Correction Officers and supervisors, and for investigations of all incidents of unjustified arrests and prosecution by their agents and/or employees." Am. Compl. ¶ 141. Furthermore, Plaintiff alleges that Defendant County failed to respond to and review "abuses" committed by prison officers and that Defendant County was "deliberately indifferent" to such acts committed by prison officers. Id. ¶¶ 142-46. But allegations of inadequate supervision, without evidence of a formal policy, policymaker action, a consistent and widespread practice, or deliberately indifferent training or supervision, do not create a genuine dispute of material fact. Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also Tuttle*, 471 U.S. at 823–24; *Brogdon*, 200 F. Supp. 2d at 427. Nor has Plaintiff established the required affirmative causal link between any County policy and his alleged injuries. *See Tuttle*, 471 U.S. at 824 n.8; *Roe*, 542 F.3d at 37; *Batista*, 702 F.2d at 397. Therefore, Defendants' Motion for summary judgment with respect to Plaintiff's *Monell* claim is granted.

**VII. Defendants Francis and Doherty are Entitled to Qualified Immunity**

Defendants' final argument is that, even if they are not entitled to summary judgment on the underlying claims, they are entitled to summary judgment under a theory of qualified immunity. For the reasons set forth below, the Court agrees.

When evaluating a claim of qualified immunity at the summary judgment stage, the Court must analyze: "(1) whether the evidence viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir. 2010). "Government actors are shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tolan v. Cotton,* 572 U.S. 650, 656 (2014) (internal quotation marks omitted) (citing *Hope v. Pelzer,* 576 U.S. 730 (2002)). "[T]he salient question…is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional." *Id.*

As evaluated above, even viewing the record and all reasonable inferences in the light most favorable to Plaintiff, the evidence does not make out a violation of Plaintiff's constitutional rights. That determination resolves the first prong of the qualified immunity inquiry in Defendants' favor. *See Tracy*, 623 F.3d at 96. Because Plaintiff has not established a constitutional violation, Defendants Francis and Doherty are entitled to qualified immunity on that basis alone.

Even if the Court were to proceed to the second prong, the inquiry required to assess a claim of qualified immunity is not framed at a high level of generality. The right of an inmate to be free from excessive force and to receive constitutionally adequate medical care was clearly established, but that alone does not resolve the inquiry. *Finnegan v. Fountain*, 915 F.2d 817, 823

(2d Cir. 1990). Instead, a Court must undertake an inquiry particularized to the facts of the situation at hand to understand whether "[t]he contours of the right [were] sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That finding does not require the very situation at hand to have been ruled upon by a controlling court, but "in light of pre-existing law the unlawfulness must have been apparent." *Id.*

Defendants first argue that they are entitled to qualified immunity because they were not aware of Plaintiff's claimed injuries, to the extent that they were the cause. Defendants rely on the video footage, which they claim establishes Defendant Francis did not use excessive force during the search of Plaintiff, in conjunction with Plaintiff's testimony and the medical records, to establish that they provided timely and appropriate medical care. See Mot. at 24; see also Ex. K, L to Mot.; 56.1 at ¶87; Ex. J. to Mot. Since qualified immunity is an affirmative defense, Defendants bear the burden of proof. *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011). Here, the undisputed portions of the record relevant to the qualified immunity inquiry, including the brief nature of the contact visible on the video, Plaintiff's description of the contact as accidental, and the substantial course of medical treatment reflected in the record, demonstrate that reasonable officials in Defendants' position would not have had fair warning that the conduct shown and supported by the record violated Plaintiff's constitutional rights.

In accepting Plaintiff's supported version of events as true and drawing all reasonable inferences in his favor, the Court still cannot conclude that the particular conduct at issue violated clearly established law. The relevant question is not whether it was clearly established in the abstract that an officer may not maliciously kick a cooperating inmate or deliberately deny treatment for serious medical needs. Rather, the inquiry is whether it would have been apparent to

a reasonable official that the brief repositioning of Plaintiff's leg during a pat-down search, which Plaintiff himself later characterized as accidental, or the medical treatment and scheduling decisions reflected in this record, crossed the constitutional line. *See Anderson*, 483 U.S. at 640. On these facts, the unlawfulness was not apparent. Accordingly, even as an alternative ground for judgment, Defendants Francis and Doherty have met their burden for summary judgment based upon qualified immunity.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is GRANTED in its entirety. Plaintiff's remaining claims are dismissed.

**SO ORDERED.**

/s/
Steven L. Tiscione
United States Magistrate Judge
Eastern District of New York

Dated: Central Islip, New York
September 18, 2026